

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. JOHN MARTIN, | ) | |
| | ) | 03 C 4364 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Honorable Charles R. Norgle |
| | ) | |
| EDDIE JONES, Warden, | ) | |
| Pontiac Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the court is Petitioner John Martin's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus - Person in State Custody. For the following reasons, the Petition is denied.

**I. BACKGROUND**

**A. Facts**

Petitioner John Martin ("Petitioner" or "Martin") is currently in the custody of Respondent Eddie Jones ("Jones"), warden of the Pontiac Correctional Center in Pontiac, Illinois. On February 28, 1997, following a jury trial, Martin was convicted of first degree murder, home invasion, and armed robbery in the Circuit Court of Cook County. At trial, Martin was confronted with a proverbial mountain of evidence, which the court outlines in section I B of this Opinion. One of those pieces of evidence was Martin's confession, in which Martin admitted to the following.

1

At 4:00 a.m. on June 22, 1993, Martin went to the home of Evelyn Pegues ("Pegues") at 333 Indianwood Boulevard in Park Forest, Illinois, and knocked on the door. When Pegues answered, Martin asked her for twenty dollars. Pegues refused, and closed the door. Angered, Martin returned to his nearby home, retrieved a butcher's knife, and went back to Pegues' home. Martin slashed the outer screen door with the knife, then used the knife to pry open the locked interior door. Upon entering the house, Martin observed Pegues attempting to run away from him towards the kitchen. Martin approached Pegues, slashed her throat with the knife, and stabbed her repeatedly in the torso. Martin then took Pegues' purse and returned home. After taking $3.35 from Pegues' purse, Martin threw the purse into a ditch behind the Park Forest Jewel Store. Martin then returned home and went to sleep.

## B. Procedural History

At a hearing on Martin's Motion to Quash Arrest and Suppress Evidence, Detective Lane Linder ("Linder") testified that Martin and his mother Vivian Martin ("Vivian") lived approximately two hundred feet from Pegues' home. Linder also testified that Pegues and Vivian had been good friends, but had experienced a falling out due to Martin's recent erratic behavior, and Pegue's recommendation to Vivian that Vivian remove Martin from her home. In addition, Linder testified that Vivian had given him permission to search Martin's room, and that Linder had found a blue towel with blood on it in that room. Linder further testified that Martin had told him that he had spent the night in question with two friends, but these friends told another Detective that Martin had left them at approximately 3:00 a.m. After hearing arguments, the Circuit Court denied the Motion to Quash and Suppress.

At trial, the following evidence was presented. Linder testified as he did at the Motion

hearing. In addition, he testified that Vivian had signed a consent form to search her home, and that Martin also had signed a similar consent form. Linder further testified that he recovered the murder weapon and additional items from Martin's home. Linder then testified that when confronted with these items, Martin confessed to killing Pegues. Martin then gave a written statement to Assistant States Attorney John Coyne ("Coyne").

Detective Butz ("Butz") testified that he recovered a blood-stained jacket from Martin's home. In addition, Butz testified that Martin directed him to the rear of the Jewel Store in Park Forest, where Butz recovered Pegues' purse. Detective Baker ("Baker") testified that he went to the Glenwood Woods South Forest Preserve with Martin, and that Martin directed him to a path where Martin had discarded a pair of gym shoes Martin said he had placed there after killing Pegues. Coyne testified as to the contents of Martin's written confession. Fingerprint experts from the Illinois State Police testified that Martin's fingerprints were found on Pegues' eyeglasses. A serologist from the Illinois State Police testified that Pegues' blood was on the towel and the knife found in Martin's home. An Assistant Cook County Medical Examiner testified that Pegues had sustained twenty-seven stab wounds, seven cutting wounds, and a slash wound on her neck, resulting in the laceration of multiple organs, and, ultimately, Pegues' death.

On February 28, 1997, a jury found Martin guilty of first degree murder, home invasion, and armed robbery. Martin waived his right to have a jury for sentencing. The court found Martin death-penalty eligible, but, after hearing arguments at the sentencing hearing, sentenced Martin to natural life in prison for the murder, and thirty years imprisonment for the home invasion and the armed robbery, to run consecutively to the natural life sentence.

On direct appeal, the Illinois Appellate Court affirmed Martin's convictions and

sentences in an unpublished Order dated May 7, 1999. The Illinois Supreme Court denied Martin's petition for leave to appeal on October 6, 1999. The Circuit Court denied Martin's post-conviction petition on March 17, 2000. The Illinois Appellate Court affirmed in an unpublished Order dated August 10, 2001. The Illinois Supreme Court denied Martin's petition for leave to appeal on December 5, 2002.

On June 23, 2003, Petitioner filed the instant Motion for habeas corpus relief, along with a set of exhibits, in the Northern District of Illinois. The State of Illinois submitted its Answer to this Petition, along with its own set of exhibits, on July 17, 2003. Petitioner filed his Reply to the State's answer on July 28, 2003. The Petition is fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Decision

Martin's Petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which sets a high hurdle for habeas relief. The statute states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision is *contrary to* clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme]

4

Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [it]." Owens v. Frank, 394 F.3d 490, 496 (7th Cir. 2005) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)). A state court's decision is an *unreasonable application* of clearly established Supreme Court law if the state court "identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407; see also Owens, 394 F.3d at 496. In order for a state court decision to be considered "unreasonable" under this standard it must be more than incorrect, it must lie "well outside the boundaries of permissible differences of opinion." Hardaway v. Young, 302 F.3d 757, 762 (7th Cir. 2002); see also Schultz v. Page, 313 F.3d 1010, 1015 (7th Cir. 2002) ("The state court decision is reasonable if it is minimally consistent with the facts and circumstances of the case.").

Before reviewing the Illinois courts' decisions, however, the court must determine whether Martin fairly presented his federal claims to the state courts. Section 2254 requires a habeas petitioner to exhaust the remedies available in state court prior to pursuing federal habeas relief. See 28 U.S.C. § 2254(b)(1)(A). Any claim not presented to the state's highest court is deemed procedurally defaulted. See O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999) (indicating that "a petition for discretionary review in Illinois' Supreme Court is a normal, simple, and established part of the State's appellate review process"). In this case, the Respondent admits that Martin has fully exhausted his state court remedies. Answer, ¶ 9.

## B. Martin's Claims for Relief under 28 U.S.C. § 2254

### 1. *The State's alleged failure to correct perjured testimony*

Petitioner first asserts that "it was reversible error for the assistant states' attorney not to correct the known perjured testimony made by its own state witness in regards to Detective Lane Linder falsely stating that he did not lift fingerprints from the crime scene." Petition, at 7. Martin asserts that this alleged failure amounts to "the knowing use of perjured testimony," and "constitutes a denial of due process . . . ." Id. Martin argues that Linder's testimony on this matter was knowingly perjured because a later State's witness indicated that Linder did take fingerprints at the crime scene.

It is well-established that "[t]he knowing use of perjured testimony constitutes a denial of due process because such 'a deliberate deception of court and jury' is 'inconsistent with the rudimentary demands of justice.'" United States v. Kaufmann, 783 F.2d 708, 709 (7th Cir. 1986) (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935)); see also Napue v. Illinois, 360 U.S. 264, 269 (1959) ("First, it is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.") (internal citations omitted).

In order to succeed on this claim, however, Martin must do more than simply show inconsistencies in the testimony of State's witnesses. "Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." United States v. Verser, 916 F.2d 1268, 1271 (7th Cir. 1990). Martin must demonstrate that "(1) the prosecution's case included perjured testimony; (2) the prosecution knew or should have

6

known of the perjury; and (3) there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." See Shasteen v. Saver, 252 F.3d 929, 933 (7th Cir. 2001); see also Kaufmann, 783 F.2d at 709.

The court declines to address the issue of whether the prosecution of this case actually included perjured testimony, or whether the prosecution knew or should have known of any allegedly perjured testimony. Instead, the court determines that, given the overwhelming evidence of Martin's guilt presented at trial, there is no likelihood that the jury's judgment was improperly affected by details regarding whether Linder did or did not lift fingerprints from the crime scene. As the court has outlined above, the evidence presented to the jury included, *inter alia*: testimony regarding a towel and a jacket found in Martin's home, both stained with Pegues' blood; the murder weapon found in Martin's home; Martin's fingerprints found on Pegues' glasses; Martin's detailed confession to the murder; and testimony that Martin led police detectives to Pegues' purse, and to the shoes he wore while committing the crime. Given the cumulative weight of this evidence, there is no "reasonable likelihood that false testimony" regarding who lifted fingerprints at the crime scene "could have affected the judgment of the jury" in this case. See Shasteen, 252 F.3d at 933. Martin's first claim for relief under § 2254 therefore fails.

### 2. *The trial court's decision not to allow testimony regarding Petitioner's shoe size*

Petitioner next asserts that "it was reversible error for the trial court to preclude testimony by a Deputy Sheriff regarding Petitioner's shoe size." Petition, at 9. Martin asserts that the trial court violated his Due Process rights by excluding testimony that would have shown that the shoes worn by the perpetrator of the crime were size 11, while his shoe size was 10.

The trial court excluded this evidence on the grounds that it was not probative, reasoning that "[t]hree years had elapsed between the date of the murder and the date of the trial," and that shoe sizes are known to "vary based on manufacturer, brand and style." People v. Martin, No. 97-1015, slip op. at 15-16 (Ill. App. Ct. May 7, 1999). There is no indication that the trial court's decision to exclude this evidence was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d). In addition, given the overwhelming evidence against Martin presented by the State, the exclusion of evidence related to Martin's shoe size could not have resulted in any "substantial prejudice" to Martin. See United States ex rel. Veal v. De Robertis, 693 F.2d 642, 650 (7th Cir. 1982). Martin's second claim for relief under § 2254 therefore fails.

### 3. Ineffective Assistance of Counsel

Petitioner next contends that his trial and appellate counsel were constitutionally ineffective. Petitioner asserts that his trial counsel was ineffective in (1) failing to impeach the testimony of Linder, and (2) refusing to investigate telephone records and witnesses. Martin asserts that his appellate counsel was ineffective in failing to attack trial counsel's effectiveness, failing to present various arguments, and failing to investigate new evidence in the form of affidavits he asserts refute Linder's claim that a bloody towel was found in Martin's home.

"The Sixth Amendment right of effective assistance of counsel applies to a criminal defendant's trial, sentencing, and the first appeal of right." Jones v. Welborn, 877 F. Supp. 1214, 1219 (S.D. Ill. 1994) (citing Pennsylvania v. Finley, 481 U.S. 551 (1987)). In order to establish

8

that his attorneys were ineffective, Martin must "show that [his] counsel's performance was deficient, and that the deficiency prejudiced [his] defense." See Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). An attorney's performance is deficient if it falls "below an objective standard of reasonableness." Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 688). Prejudice is established by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Benefiel v. Davis, 357 F.3d 655, 662 (7th Cir. 2004) (quoting Strickland, 466 U.S. at 694).

When a court reviews an ineffective assistance of counsel claim, the court's review is "highly deferential" to the attorney, "with the underlying assumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" United States v. Holman, 314 F.3d 837, 840 (7th Cir. 2002) (quoting Strickland, 466 U.S. at 689). There is therefore a strong presumption that Martin's attorneys performed reasonably. See Strickland, 466 U.S. at 690; see also Cooper v. United States, 378 F.3d 638, 641 (7th Cir. 2004). To succeed in his claim, Martin must show "errors so serious that counsel was not functioning as the 'counsel' guaranteed [to him] by the Sixth Amendment . . . ." See Holman, 314 F.3d at 839 (quoting Strickland, 466 U.S. at 687).

Here, most of Martin's assertions regarding the ineffectiveness of his attorneys focus on strategic decisions made by these attorneys at trial and on appeal. The court is reluctant to engage in second guessing, or "Monday morning quarterbacking," regarding counsel's strategic decisions in this case. See Harris v. Reed, 894 F.2d 871, 877 (7th Cir. 1990). Martin's remaining assertions focus on his attorneys' alleged refusal to investigate witnesses or "new"

9

evidence. In rare cases, an attorney's failure to investigate or call certain witnesses can constitute ineffective assistance of counsel. See Hampton v. Leibach, 347 F.3d 219 (7th Cir. 2003); Sullivan v. Fairman, 819 F. 2d 1382, 1390 (7th Cir. 1987). In this case, however, the court determines that counsels' alleged failure to investigate affidavits or telephone records does not rise to the level of objective unreasonableness. See Strickland, 466 U.S. at 688. The court finds that there is no indication in the record that Martin's attorneys, at either the trial stage or the appellate stage, made errors so serious that counsel was not functioning as the "'counsel' guaranteed [to him] by the Sixth Amendment . . . ." See Holman, 314 F.3d at 839 (quoting Strickland, 466 U.S. at 687). Martin's third claim for relief under § 2254 therefore fails.

### 4. *Apprendi claim*

Finally, Martin asserts that the "trial court's finding that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty was unconstitutional, and the 30 year consecutive sentence void because the finding was not submitted to a jury for proof beyond a reasonable doubt." Petition, at 15. The court construes this assertion to be a claim for relief under the rule laid down by the Supreme Court in Apprendi v. New Jersey: "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000); see also Blakely v. Washington, 542 U.S. 296, 301 (2004); United States v. Booker, 543 U.S. 220, 244 (2005).

The Seventh Circuit has held that Apprendi "does not disturb sentences that became final before June 26, 2000, the date of its release." United States v. Curtis, 294 F.3d 841, 844 (7th Cir. 2002); see also Lambert v. McBride, 365 F.3d 557, 562 (7th Cir. 2004). The Seventh Circuit has

10

also held that Booker "does not apply retroactively to criminal cases that became final before its release on January 12, 2005." McReynolds v. United States, 397 F.3d 479, 481 (7th Cir. 2005); see also United States v. Paladino, 401 F.3d 471, 481 (7th Cir. 2005). Martin's sentence became final on October 6, 1999, when his petition for leave to appeal was denied by the Illinois Supreme Court. Martin's Apprendi/Booker claim (if, indeed, he is making one) is therefore barred under the rules explained in Curtis, 294 F.3d at 844 and McReynolds, 397 F.3d at 481.[1] Martin's fourth and final claim for relief under § 2254 therefore fails.

### III. CONCLUSION

For the foregoing reasons, Martin's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus - Person in State Custody is denied.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

Dated: August 1, 2006

---

[1] Even if the court adds ninety days for Petitioner to have filed a petition for writ of certiorari with the United States Supreme Court, Martin's conviction still became final before Apprendi was released.

11